UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL HOLZMEYER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 1:12-cv-01737-SEB-DML |
| WALGREEN INCOME PROTECTION | ) | |
| PLAN FOR PHARMACISTS AND | ) | |
| REGISTERED NURSES, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on the parties' cross motions for summary judgment on

Plaintiff's suit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §

1132(a)(1)(B), for judicial review of the denial of long-term disability benefits. For the reasons

set forth below, Plaintiff's motion for summary judgment [Docket No. 27] is GRANTED, and

Defendant Walgreen Income Protection Plan's motion for summary judgment [Docket No. 29] is

DENIED.

## Factual Background

**A. Holzmeyer's treatment history**

Plaintiff Michael Holzmeyer is a resident of Indiana and a former employee of Walgreen,

Inc. ("Walgreens"). Am. Comp. ¶ 2. Holzmeyer is a doctor of pharmacy and a licensed

pharmacist, who from 2003 to 2009 worked for Walgreens as a "retail pharmacy manager." R.

369.[1] In September 2009, Holzmeyer began working for Walgreens as a "home pharmacist," a position in which he reviewed the filling of orders and prescriptions by the company's retail pharmacists from his home via computer. Docket No. 28 at 2.  Holzmeyer was enrolled in the Walgreen Income Protection Plan for Pharmacists and Registered Nurses ("Plan"), a self-funded employee benefits plan under ERISA, whose claim administrator is Sedgwick Claims Management Services, Inc. ("Sedgwick"). Pl.'s Ex. 2 at 22.[2]

The Plan provides both short-term and long-term disability benefits for its enrollees, and it defines long-term "disability" as follows:

> For the long-term disability period, "disabled" or "disability" means that, due to sickness, pregnancy, or accidental injury, you are prevented from performing one or more of the essential duties of your own occupation and are receiving appropriate care and treatment from a doctor on a continuing basis; and
>
> For the first 18 months of long-term disability, you are unable to earn more than 80% of your pre-disability earnings or indexed pre-disability earnings at your own occupation for any employer in your local economy;
>
> Following that 18 month period, you are unable to earn more than 60% of your indexed pre-disability earnings from any employer in your local economy at any gainful occupation for which you are reasonably qualified, taking into account your training education, experience and pre-disability earnings.

Pl.'s Ex. 2 at 8. The Plan further defines an enrollee's "own occupation" as "the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you hold or held with Walgreens. It may be a similar activity that could be performed with Walgreens or any other employer." *Id.* at 9.

Holzmeyer has a lengthy history of back problems, stemming originally from an automobile accident in December 1986 in which he fractured his spine and underwent fusion

---

[1] The administrative record (which we will abbreviate as "R.") in this case can be found at Docket No. 30, where it has been submitted by Defendant, broken into 24 parts.
[2] The Plan text may be found at Docket No. 28, as Plaintiff's Exhibit 2.

surgery.[3] Docket No. 28 at 8 (citing R. 147, 149). In 2009, while living in Florida, he began to experience serious back pain and sought treatment at Tampa Bay Orthopaedic specialists. In a July 9, 2009 visit with Dr. Howard Sharf, Holzmeyer reported back pain, deep vein thrombosis in his left leg, and foot pain; Dr. Sharf noted that Holzmeyer had an abnormal gait and displayed tenderness in his spinal area. He conducted imaging which showed "significant degenerative changes of the lumbar spine including the sacroiliac joints" and the appearance of "disengagement of one of his most superior hooks." R. 520–521.[4] Dr. Sharf later examined Holzmeyer in a follow-up appointment and scheduled CT scans of his spine. R. 522. Several months later, on February 17, 2010, Holzmeyer saw Dr. Gary Holland in an effort to deal with continuing back pain. He reported that the back "bracket" set up by his previous surgery seemed to be "breaking," and he complained of increased pain and diminished mobility. Dr. Holland noted that Holzmeyer's range of motion was "significantly limited by pain." R. 553.

Holzmeyer underwent a CT scan of his cervical spine, thoracic spine, and lumbar spine on April 7, 2010. The scan revealed multilevel disc bulging with some "unremarkable" degenerative changes in the cervical spine; it also showed deterioration in the condition of the Harrington rods that had been implanted during his first back surgery. R. 105. On April 23, 2010, Holzmeyer consulted with Dr. Glenn Fuoco at Tampa Bay Orthopaedic Specialists, to whom he

---

[3] His surgery was a "T8-L3 fusion" involving the implantation of Harrington Rods, intended to stabilize his spine. Docket No. 28 at 8.

[4] The doctor's notes reflect that Holzmeyer complained of his pain as follows:

> He now has increased pain in the last week or so in his lower back after doing some lifting prior to his pain starting. It radiates along the back and eventually up to his neck and causes some headaches. He has no change in symptoms with change in position. It does awaken him from sleep. He has two joints of maximum pain, one in the mid-thoracic region, and one around the right sacroiliac joint. . . . He rates his pain as 7/10 with all axial pain at the neck and equal back and leg pain at the lower back. He can stand for 5 minutes, walk 500 feet . . . .

R. 520.

had been referred by Dr. Sharf. Holzmeyer reported to Dr. Fuoco that he had pain "across the lower back, right greater than left, [with] some symptoms shooting pains and numbness into the right leg." R. 96. He also told the specialist that his 2009 shift to a primarily sedentary position as a "home pharmacist" had exacerbated his pain issues; Dr. Fuoco noted that "since September [2009] he has been doing sitting work and this has caused a lot of the lower pack pains. He has to sit with his left leg elevated [due to a clotting issue] which is aggravating his back pain." *Id.* He further noted that Holzmeyer rated his lumbar spinal pain at "7 to 8/10" and assessed his standing tolerance as 5 to 10 minutes only. *Id.* Dr. Fuoco later administered a bilateral sacroiliac joint injection in an effort to ameliorate Holzmeyer's pain. R. 108, 120–121. At a follow-up appointment with Dr. Fuoco two weeks after the injection, Holzmeyer reported that his symptoms had temporarily eased, but had returned only days after the injection. Dr. Fuoco then recommended a different pain-relief injection—a caudal epidural. R. 123, 532, 543–544. Holzmeyer later reported that this injection, too, produced only temporary relief and had no longer-term effect on his chronic pain. R. 129.

On July 1, 2010, Holzmeyer visited the Laser Spine Institute, where he reported an average pain level of "9/10" when active and "6 to 7/10" when resting; examination revealed tenderness at several of his vertebrae and a limited range of motion. R. 160–161.[5] After another examination on July 7, he was scheduled for a second back surgery. Two doctors at the Institute performed the surgery on July 20—an operation which consisted, in their words, of three procedures: destruction by thermal ablation of the paravertebral facet joint nerves, lumbar laminectomy and foraminotomy, and an additional caudal epidural steroid injection. R. 166.[6]

---

[5] Less than a week later, Holzmeyer also had another appointment with Dr. Holland of the Tampa Bay Orthopaedic Specialists, who noted that he continued to suffer from "longstanding chronic back pain with tenderness throughout the low back." R. 558.

[6] The record contains a more detailed description of the operation performed. *See* R. 166–168.

After initially reporting some improvement, Holzmeyer contacted the Institute in August 2010 to tell them that his lower back pain had returned; the Institute's treatment note indicates that "[Holzmeyer] feels he is deteriorating due to returning pain in his right hip and [lower extremity]." R. 170. On September 1, 2010, a physician with the Institute administered another caudal epidural steroid injection. R. 483–484. Mr. Holzmeyer underwent an MRI on September 27, 2010. The presence of metal distorted some of the readings, but the imaging report noted abnormalities on the "L4-5 level" indicating "degenerative disc disease"; it further stated that "nerve root compression cannot be excluded on a degenerative basis." R. 549.

After Holzmeyer moved to Indiana, he became a patient of Dr. Ross Whitacre, an orthopedic specialist at Tri-State Orthopaedics; his first appointment occurred on October 18, 2010. R. 192–194. At this initial appointment, Dr. Whitacre noted that Holzmeyer had "significant lumbar spondylosis with stenosis at L4-5" that had been "incompletely resolved" by his July 2010 surgery, "symptomatic spondylosis of the lower lumbar levels," neck pain with "fluctuant soft tissue mass over the cervicothoracic junction," and headaches "that appear to be tension related." R. 193. Tri-State ordered a CT scan the same day; the scan analysis notes that while there is no "acute fracture or dislocation" of the spine as a whole, the L4-L5 vertebrae showed "broad-based disc osteophyte complex which appears to be causing moderate to severe central spinal canal stenosis." R. 194. When initial efforts at pain management, including "back blocks," did not produce satisfactory results, Dr. Whitacre referred Holzmeyer to Dr. John Grimm, an orthopedic surgeon affiliated with Tri-State. After an examination, Dr. Grimm summarized Holzmeyer's reported symptoms as follows:

> He points to the worst of his complaints in his low back at the lumbosacral junction. The pain also does radiate bilaterally into the lateral aspects of his hips and down the lateral aspects of his thighs into his calves. He states that the left leg

is much worse than the right. He has no bowel or bladder dysfunction or gait disturbance. Walking is the worse of his complaints, which he only can do for less than a block. Standing also greatly increases the pain and he cannot tolerate standing for more than 10 minutes. He states that sitting is tolerated for about 30 minutes. He feels as though his condition is slowly getting worse over time.

R. 256. Dr. Grimm's spinal examination revealed "tenderness throughout the entire thoracic and lumbar spine," although he stated that "motor, reflex, [and] sensory testing in the upper extremities reveals no deficit." R. 257. Grimm judged Holzmeyer's latest CT scan to show "moderate collapse" of the L4-5 disc, and some deterioration of the "hook" portion of the hardware installed by the 1987 fusion surgery. *Id.* Dr. Grimm assessed Holzmeyer with an "Oswestry Disability Index" score of 70%.[7] *Id.*

On December 22, 2010, Holzmeyer underwent another CT scan of his spine, which showed a "right laminectomy defect" with "moderate to severe central spinal canal stenosis" at vertebrae L4-L5, "mild central stenosis" at the L3-L4 vertebrae, and some other non-severe abnormalities.[8] R. 266–269. On January 13, 2011, Holzmeyer had a third back surgery, this time performed by Dr. Matthew Kern of Comprehensive Neurosurgical Specialists in Evansville, Indiana. R. 944.[9] When Holzmeyer visited Dr. Kern for a follow-up two months later, he reported to the surgeon that "his preoperative [back] pain has pretty much resolved." *Id.* He did,

---

[7] As Plaintiff explains, the Oswestry Disability Index (ODI) is a tool used by physicians in assessing chronic back pain and managing spinal disorders: http://www.ncbi.nlm.nih.gov/pubmed/11074683. According to the National council for Osteopathic Research, a score between 61% and 80% indicates that "back pain affects all aspects of the lives of these patients in their home and working environment. They require active intervention." http://www.ncor.org.uk/wp-content/uplaods/2012/12/Oswestry-Disability-questionnairev2.pdf (last visited August 12, 2014). Docket No. 28 at 15 n.15.

[8] The scan report stated as follows with respect to the L4-L5 vertebrae: "At L4-L5 level, there appears to be a broad-based disc protrusion. There is associated posterior osteophyte formation demonstrated. There is a laminectomy defect on the right at this level. There appears to be moderate to severe central spinal canal stenosis at this level. There is moderate bilateral neural foraminal narrowing demonstrated. There are moderate degenerative changes involving the bilateral facet joints." R. 268.

[9] The operation notes for this surgery are not in the record, but Dr. Kern's post-operative notes discuss the basics of the surgery. R. 944.

however, report pain in his buttocks that was severe enough to force cancellations of home physical therapy sessions. *Id.*

In April 2011, Holzmeyer had his first appointment with Dr. Steven Rupert, a pain management specialist. R. 224–228.  According to Dr. Rupert, Holzmeyer reported back pain that "increases with standing, sitting in the same position, [and] laying [sic] down," which afflicted him every day of the week. R. 224. On examination, Dr. Rupert found that a number of areas in Holzmeyer's back were "tender with palpation," and his overall diagnosis was "failed back syndrome." R. 228.  At a follow-up visit with his surgeon Dr. Kern the same month, Holzmeyer reported that, notwithstanding his temporary post-surgical improvement in pain, all of his preoperative symptoms had now returned. R. 223. Declaring that further surgical options were inadvisable, Dr. Kern told Holzmeyer that he did not 'have anything further to offer him," and he directed him back to Dr. Whitacre to attempt pain management. *Id.*

Holzmeyer had additional appointments with pain management specialist Dr. Rupert on June 1 and July 21, 2011. On both occasions, Holzmeyer reported suffering constant pain in his lower back and hip/buttocks areas, exacerbated by lying down, movement, and standing. R. 242, 245. After Dr. Kern advised against further surgery, Holzmeyer also saw Dr. Whitacre on July 20, 2011 and inquired about the possibility of undergoing epidural therapy. Noting the persistence of Holzmeyer's tenderness "over the lumbosacral junction and higher up at the thoracolumbar interface" as well as "postphlebitic syndrome in the lower extremity with the calf being markedly [larger] circumferentially of the left than the right," Dr. Whitacre scheduled Holzmeyer for a high-volume caudal epidural steroid injection. R. 249. Holzmeyer received the injection on August 16, 2011. R. 327–328.

At a subsequent appointment with Dr. Whitacre on September 19, 2011, Holzmeyer reported that the steroid injection had not been effective—pain had returned after three days—and he had not gone through with the second scheduled injection. R. 323. Dr. Whitacre described Holzmeyer's condition as follows:

> His standing tolerance is limited to 5-10 minutes at most. Sitting is more uncomfortable than standing but not by much. He does not feel comfortable at work in terms of his positional intolerance as well as his inattentiveness secondary to his medications . . . . We had a long discussion today about medication management. I am afraid that one of the things limiting him from returning to gainful employment is his inattentiveness and some of the side effects from the medication.

*Id.* Physical examination of Holzmeyer at the same appointment revealed "significant extension-based back pain" and limited range of motion in the spine. Holzmeyer saw Dr. Whitacre again on October 24, 2011; at this appointment, Holzmeyer and the doctor discussed the "physical capacity evaluation" Whitacre had filled out in July as part of Holzmeyer's disability application process (*see below*). As Dr. Whitacre noted:

> His pain continues to be worse with upright standing and walking. He tells me he spends 90% of his day recumbent. In fact, he has some concerns about the report I had filled out earlier as part of his disability paperwork. I indicated he could stand or walk several hours per day so long as breaks were allowed. He estimates today that he walks only when he has to go outside the home. He tells me he literally spends 90% of his time reclined. I questioned this a few times, but he reasserts the fact that he rarely if ever is actually seated upright in a chair, and even more rare is the occasion where he is standing or walking. He says he can walk 1 lap around the grocery store. He would not be able to do a home pharmacy because of the distractibility secondary to narcotic medications in his own words. He says that his pain is so intense when he is upright that he cannot focus and gives the example of his fidgeting in the seat today as evidence of his distractibility.

R. 325. Dr. Whitacre noted no changes from the September appointment in his physical examination of Holzmeyer. A CT scan a week later revealed that Holzmeyer's most recent

surgery had resulted in "successful lumbar surgical decompression," but noted the persistence of "chronic degenerative disease" and scoliosis. R. 329.[10]

On December 20, 2011, Holzmeyer saw Dr. William Ante, a Tri-State pain specialist to whom he had been referred by Dr. Whitacre. R. 387–389. Dr. Ante noted as follows:

> His main complaint is his low back pain. It feels like aching, burning, and sharp pain in both sides of the back equally. If he sits for a prolonged period of time or drives for a prolonged period of time he will have numbness in the lateral thighs bilaterally. He thinks that he has been worsening the past two months. He does have some numbness in the left lateral ankle and foot but he attributes that to a deep venous thrombosis.

R. 387. Dr. Ante also discussed the benefits and drawbacks of implanting a "drug pump" in a more aggressive attempt to alleviate the back and hip pain. R. 389. In the most recent medical consultation disclosed in the record, Holzmeyer sought treatment at OrthoIndy; during his appointment on May 3, 2012, he reported a back pain level of 8/10, and a nurse practitioner's examination showed tenderness "diffusely through the lumbosacral region" with restricted range of motion. R. 561.

**B. The disability benefits review process**

Michael Holzmeyer stopped his work as a home pharmacist for Walgreens on April 4, 2010; he has not worked since. Shortly after he stopped work, Holzmeyer applied for, and received, short term disability benefits from Walgreens. R. 173. He received the short term benefits from April 7 to October 3, 2010—the full six month period in which a disabled employee can receive short term benefits under the Plan. R. 176–177; Pl.'s Ex. 2 at 8.

---

[10] After a December 29, 2011 follow-up appointment to discuss the results of his October CT scan, Dr. Whitacre noted the persistence of Holzmeyer's "extension-based lumbosacral junction pain." R. 386.

After the expiration of his short term benefits, Holzmeyer sought long-term benefits. Sedgwick approved his application initially, but stated in its letter to him that the approval was not permanent in nature, and could renew or lapse depending on Holzmeyer's health status. In claim notes dated October 4, 2010, Sedgwick approved Holzmeyer for benefits through October 19, to allow additional time for him to recover from his July 2010 back surgery. R. 176. Sedgwick's letter to Holzmeyer stated that additional documentation would be necessary in order for benefits to be continued; it also informed him that he was obligated to apply for Social Security disability benefits pursuant to his Plan. R. 177. Sedgwick subsequently renewed Holzmeyer's long-term benefits several times. On October 21, 2010, Sedgwick notified him that his benefits had been extended to December 31. R. 196–197. After Holzmeyer's third back surgery on January 13, 2011, Sedgwick sent him a letter the next day extending benefits again, this time through March 31. R. 206–207. Two more extensions from Sedgwick prolonged Holzmeyer's receipt of benefits through August 31, 2011. R. 212, 272.

In each of its letters extending benefits, Sedgwick notified Holzmeyer that continuation of benefits past a given end date would depend on his providing additional, up-to-date documentation of his condition, including copies of the most recent office notes and "operative test results and diagnostic test results," names and dosages of all medications, and "details on restrictions and limitations." *See* R. 272–273.

As part of its effort to document Holzmeyer's work-related limitations, Sedgwick in the summer of 2011 obtained "functional capacities evaluations" (FCEs)[11] from two of Holzmeyer's treating physicians: Dr. Whitacre and Dr. Rupert. Dr. Rupert filled out his functional capacity

---

[11] Some of the record documents refer to these as "physical capacity evaluations." We use the term "FCE" throughout for the sake of simplicity.

form on July 21, 2011. He opined that Holzmeyer was capable of sitting, standing, or walking for only up to one hour each in a given eight-hour workday. Where prompted to mark the "total hours per day [the] patient is capable of working," R. 237. Dr. Rupert indicated a maximum of three hours—if allowed to lie down every hour and given breaks every 30 minutes. Dr. Rupert concluded that these restrictions on Holzmeyer's working capacity were "permanent." *Id.* Dr. Whitacre filled out the same form on August 9, 2011. For his part, he found that Holzmeyer could sit for three to four hours a workday (with breaks every 15 minutes), stand for three hours a day (with breaks every 20 minutes), and walk for up to an hour (with breaks every 15 minutes). R. 248. Within those limits, Whitacre determined that Holzmeyer was capable of working a full eight hours daily. *Id.* In contrast to Dr. Rupert, Whitacre opined that these restrictions were "temporary," to be reassessed upon Holzmeyer's next appointment.[12]

Sedgwick also retained two physicians to offer opinions on Holzmeyer's functional physical capacity based on record review; neither doctor examined Holzmeyer in person. Dr. Victor Parisien reviewed Holzmeyer's records and submitted his opinion on August 19, 2011. His report recited that he had had access to the following record items in formulating his opinion: progress notes from the Laser Spine institute surrounding his second (July 2010) back surgery; progress notes from his appointments at Tri-State Orthopaedics (chiefly with Dr. Whitacre); notes from Dr. Kern surrounding his third surgery; pain management specialist Dr. Rupert's notes from April 13, 2011; CT scan results from October and December 2010; and Dr. Whitacre's July 2011 "functional capacity evaluation." R. 279. Dr. Parisien stated in his report that he had contacted Dr. Whitacre's office in order to consult with the care provider about

---

[12] Both doctors additionally found extensive restrictions on Holzmeyer's ability to lift and carry objects of various weights. Since these restrictions do not bear on his ability to perform the job of a "home pharmacist," they do not need to be discussed in detail. *See* R. 237, 248.

Holzmeyer's condition, but Whitacre had not returned his calls. Instead, he had spoken to Delia Lowe, Whitacre's surgical technician, who had told him that "Dr. Whitacre agrees that the patient could do a sedentary job with restrictions as outlined in his functional capacity evaluation of 8/9/11. Even with these restrictions, he should be able to do his sedentary jobs of a pharmacist." *Id.* In answer to Sedgwick's questions, Dr. Parisien stated that "[t]the patient has had extensive spinal surgery on a number of occasions and continues to have pain on sitting, standing, and walking. These conditions may affect his ability to work." R. 280. Relying on Dr. Whitacre's FCE, however, Parisien went on to assert that "objective medical information" substantiating Holzmeyer's claim of disability was lacking: "There is nothing in the medical record that would support the employee's complete inability to work. He has had a recent Functional Capacity Evaluation with work capacity." R. 281. He went on to note that the record showed limited range of motion and diminished sensation, but that "orthopedic tests are negative" and none of the CT results "would explain his complaints of pain and none . . . would limit his ability to do a sedentary job." *Id.*

On August 22, 2011, Dr. Jamie Lee Lewis submitted a report to Sedgwick in the same format. Unlike Parisien, Dr. Lewis was evidently assigned to review the opinions of Dr. Rupert rather than Dr. Whitacre; however, he stated that his attempts to contact Rupert were unavailing. R. 276. In the absence of any direct communication with Rupert, Lewis based his record review on only the following files: Laser Spine Institute notes from July to August 2010; Dr. Kern's progress notes from February to July 2011; and Dr. Rupert's treatment notes from April 13 to July 1, 2011. *Id.* Lewis recognized that Rupert had documented Holzmeyer's "chronic low back pain," but he asserted that the pain should not necessarily be construed as a barrier to working capacity: "Given the chronicity of patient's symptoms if medications [sic] side effects resulted in

functional impairment[,] appropriate action would be to discontinue medication and rotate to a better tolerated agent. As such a functional limitation as a result of a pharmacological agent would not be supported in this chronic setting." R. 277. Although he acknowledged that the January 2011 surgery reflected a "complex history of spinal stenosis," Lewis stated that, in the absence of follow up notes from that most recent surgery, he lacked objective medical evidence supporting a finding of disability—instead, he found that Holzmeyer was capable of working if "limited to sedentary work secondary to lumbar spine pathology and difficulty with mobility." *Id.* Lewis summarized his conclusion as follows:

> The medical documentation identifies [that] the patient has complex history of spinal stenosis[,] having undergone a multilevel laminectomy in January of 2011 with associated fusion. The notes by Comprehensive Neurosurgical Specialists identify [that] the patient has some difficulty walking in the postoperative state after fusion and ultimately underwent a second laminectomy as described. Follow-up notes from the secondary laminectomy were not provided for review to assess the patient care and progress. From a physical medicine and rehabilitation perspective, the employee is able to perform a sedentary job as of 07/01/11 with no objective findings to support the contrary.

*Id.*

In a letter to Holzmeyer dated October 3, 2011, Sedgwick announced that Holzmeyer's long-term disability benefits had been terminated as of September 20, 2011. The letter recited that Sedgwick had reviewed treatment notes from Drs. Rupert, Whitacre, and Kern, and that it had considered the FCEs submitted by both Rupert and Whitacre, together with the reviews of these doctors' recommendations conducted by Drs. Lewis and Parisien, respectively. R. 284–285. As Sedgwick explained, it relied primarily on the two FCEs and the analyses of the record-reviewing physicians; in each case, it determined that, "[i]n view of the medical records provided and from the orthopedic standpoint, you are capable of doing a sedentary job." R. 285. Based on a discussion with "human resource generalist" Ashley Raybuck, Sedgwick indicated that it had

learned that Holzmeyer worked as a "home pharmacist, which is a sedentary position. This position would allow for breaks from sitting as indicated in the restrictions and limitations." Based on this assessment of his functional capacities and the nature of his occupation, Sedgwick concluded that "there is no objective medical documentation to support restrictions and limitations that would prevent you from perform [sic] your sedentary job duties." R. 285.

## C. Holzmeyer's administrative appeals

In November 2011, Holzmeyer appealed Sedgwick's termination of his long term disability benefits. In support of the appeal, he submitted several new documents, most significant of which was information regarding his approval for SSDI benefits from the Social Security Administration (SSA). The Plan mandated that Holzmeyer apply for SSDI, and Walgreens had contracted with USI Midwest, a social security vendor, to assist him in preparing the application. In a letter dated October 22, 2011, the SSA found Holzmeyer to be disabled as of April 4, 2010—the day he had quit work at Walgreens—and approved him for benefits. R. 298–301. In addition to evidence that he had met the SSDI standard for disability, Holzmeyer also submitted medical information reflecting his ongoing treatment. These included records of appointments with Dr. Whitacre on September 19 and October 24, 2011; records of an August 16, 2011 epidural injection, and a CT scan performed on October 31, 2011. *See* R. 321–329.

Sedgwick's internal notes indicate that, in considering Holzmeyer's appeal, it sought a further job description from Walgreen's HR representative Ashley Raybuck. R. 48. Those same internal notes show that Sedgwick received only a broad description from Walgreen's HR department—that Holzmeyer was an "@ home pharmacist" [sic] whose job was "sedentary" in

nature. R. 49; 341–342. Sedgwick also obtained opinions from two more physicians, each of whom reviewed elements of Holzmeyer's records but did not examine him in person.

Dr. John Graham provided the first review, dated January 19, 2012. R. 344–350. Dr. Graham noted that he had attempted to call Dr. Whitacre and Dr. Sharf regarding Holzmeyer's condition, but had failed to reach either physician. R. 344–345. His report reviews the medical record at length, and it mentions the FCE conducted by Dr. Rupert and the record reviews conducted by Drs. Parisien and Lewis. Graham also noted that, since his initial FCE, Dr. Whitacre had modified his conclusions after a subsequent visit with Holzmeyer:

> Dr. Whitacre indicate [sic] he could revise his statement to be more in line with that of Dr. Rupert, who indicated with standing, sitting and walking up to an hour with viewing a computer screen for 8 hours, as long as he had the ability to lay down every hour. Subjectively this seems to fit more with what the patient describes himself doing at home, though I have no objective evidence obviously of what he actually does at home, nor do I have a functional capacity evaluation for instance, which would provide objective data.[13]

R. 346. Graham acknowledged that Holzmeyer suffered "chronic low back and lower extremity pain," recognizing that various attempts at assuaging it had been unavailing; he also acknowledged the concerns Holzmeyer had expressed about the "distractibility" from his pain medications depriving him of the high level of concentration necessary to perform his job, but Graham determined that "the documentation available for review provides no clinical findings" to support that concern. R. 349. Graham reached the conclusion that limited range of motion was the only physical limitation that was documented in the record—but he opined that "from an orthopedic perspective, the patient would be able to perform his regular unrestricted job as an in-

---

[13] It is not clear why Dr. Graham claimed not to have a "functional capacity evaluation" from Whitacre. His discussion of the file review elsewhere in his report indicates that he saw the FCE that Whitacre performed on August 9, 2011. R. 346.

home pharmacist, for the dates in question." *Id*. Dr. Graham made no mention in his report of Holzmeyer's SSA disability finding.

Dr. Howard Grattan provided the second record review to Sedgwick, also dated January 19, 2012. Like Graham, Grattan reported that he was unsuccessful in his attempts to speak to Holzmeyer's treating physicians—in his case, he called the offices of Drs. Rupert and Fuoco, but spoke only to receptionists. R. 351–352. He opined that, while Holzmeyer demonstrated objective deficits in his range of motion, such handicaps would not impact his ability to fulfill the requirements of the "home pharmacist" position. *Id.* Dr. Grattan summarized his opinion as follows:

> Subjectively the patient reports of not being able to get out of a reclined chair for 90% of the day and the patient self-reports distractibility secondary to medications. However, the employee's self-reported side effects from medications are not supported by clinical documentation. Based on the medical information provided for the review, the patient had intact strength, sensation and coordination of his upper and lower extremities. There are no objective deficits in the documentation that would prevent him from doing a sedentary duty occupation. Based on the job description, the employee would be . . . able to perform the home pharmacist duties, which are noted as assisting the retail stores (verifying prescriptions), a sedentary occupation with telephone and computer use [and] no contact with customers. Therefore, the employee is not disabled from his regular unrestricted job as of 9/20/11 to return to work from a physical medicine and rehabilitation perspective.

R. 354. Like Graham's, Grattan's report did not address Holzmeyer's SSA finding of disability.

Sedgwick denied Holzmeyer's appeal of the long term disability benefits termination in a letter dated February 10, 2012; the letter recapitulated the findings of Drs. Graham and Grattan and echoed their conclusions. R. 355–356.

Sedgwick's appeal denial advised Holzmeyer that he had the option of filing a second administrative appeal, and Holzmeyer did so on May 10, 2012. In a letter to Sedgwick, Holzmeyer's attorney, Mike Hayden, again directed Sedgwick's attention to the SSA's favorable

disability finding and also raised concerns about Holzmeyer's lower extremity issues (including deep vein thrombosis) and the impact of his heavy painkiller regimen on the professional diligence and concentration required of his home pharmacist position. R. 364–366. Sedgwick denied this second appeal on August 22, 2012. R. 1065. In turning down the second appeal, Sedgwick again relied on the opinions of two record reviewing physicians—this time, Drs. Leonard Sonne and Richard Kaplan. In opinions similar to those expressed by the four other physicians relied upon by Sedgwick at earlier stages of the process, Sonne and Kaplan acknowledged the presence of some functional limitations, but stated that Holzmeyer's own reports of his pain-related disability were unsupported by the evidence; both doctors found that Holzmeyer was capable of performing his job as a home pharmacist.[14]

After the denial of his second appeal, Holzmeyer filed this claim under ERISA on November 27, 2012.

## Legal Analysis

### Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986).  The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[14] As Plaintiff points out, the reports of Drs. Sonne and Kaplan both originally preceded under the assumption that disability for Holzmeyer was defined by his inability to perform *any* occupation rather than his "*own* occupation"— home pharmacist. Sedgwick sought addenda from both physicians to rectify this error, but in doing so it made another: it asked them to evaluate Holzmeyer's fitness to work as a *retail* pharmacist rather than a home pharmacist. Sedgwick responded by asking for additional clarifications from both doctors, and both reaffirmed their opinions in light of the "own occupation" disability standard. *See* R. 1040–1052.

Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

## Discussion

## I.    Legal Standard

Plaintiff's claim arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), a statute "enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113 (1989). ERISA provides that plans covered by the statute must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). ERISA further mandates that plan procedures "afford a reasonable opportunity . . . for a full and fair review" of dispositions adverse to the claimant. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830–831 (2003) (citing 29 U.S.C. § 1133(2)). In fulfilling their duties towards employees covered by plans, administrators must act solely in the interests of the plan participants, and faithfully discharge the standards set forth in plan documents. *See* 29 U.S.C. § 1104(a)(1).

For the first 18 months after an employee quits work—the time period at issue here—the Walgreens Plan defines "long term disability" as follows:

> [You are disabled if,] [d]ue to sickness, pregnancy, or accidental injury, you are prevented from performing one or more of the essential duties of your own occupation and are receiving appropriate care and treatment from a doctor on a continuing basis; and . . . you are unable to earn more than 80% of your pre-disability earnings or indexed pre-disability earning at your own occupation from any employer in your economy.

Pl.'s Ex. 2 at 8. Here, both parties agree that the Plan vests discretion in Sedgwick, the claim administrator, to make benefits decisions and construe the Plan's terms. *See* Docket No. 30 at 12; Docket No. 28 at 38. Accordingly, we accord some deference to Sedgwick's decisions, overturning them only if they constituted an "abuse of discretion"—or, in other words, if the administrator's actions were "arbitrary and capricious." *See Raybourne v. Cigna Life Ins. Co. of N.Y.*, 576 F.4d 444, 449 (7th Cir. 2009) ("A plan's express grant of discretion to the administrator lowers the standard of judicial scrutiny from de novo to abuse-of-discretion."); *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006) ("When, as here, the terms of an employee benefit plan afford the plan administrator broad discretion to interpret the plan and determine benefit eligibility, judicial review of the administrator's decision to deny benefits is limited to the arbitrary-and-capricious standard.")

Our review under this standard is not, however, a "rubber stamp." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010). The Seventh Circuit has described the courts' duty as ensuring that a plan administrator followed adequate procedures, particularly that it "communicated 'specific reasons' for its determination to the claimant." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009). A decision may also be arbitrary and capricious if there is "an absence of reasoning in the record to support it," or if the decision failed to draw a

logical link between the conclusion and its supporting evidence. *Leger v. Tribune Co. Long Term Disability Benefit Plan,* 557 F.3d 823, 831 (7th Cir. 2008); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774–775 (7th Cir. 2003). In sum, we must overturn a denial of disability benefits where the administrator's application of the employee's plan was "downright unreasonable." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009). When the action under review is an administrator's denial of an appeal, the same strictures of reasonableness apply; to survive scrutiny, the denial must "address any reliable, contrary evidence presented by the claimant." *Majeski,* 590 F.3d at 484, *Love v. Nat'l City Corp. Welfare Benefit Plan*, 574 F.3d 392, 397–398 (7th Cir. 2009).

In reviewing a plan administrator's exercise of its vested discretion in denying disability benefits pursuant to ERISA, we limit the scope of our consideration to the administrative record upon which the decision was based. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan,* 195 F.3d 975, 981 (7th Cir. 1999) ("Deferential review of an administrative decision means review on the administrative record."). Consideration of extraneous evidence is not appropriate.[15]

Here, Plaintiff objects to both Sedgwick's termination of his benefits in September 2011 and its denial of his two subsequent appeals. We conclude that Sedgwick's decision was unreasonable in both instances and address each aspect of Plaintiff's claim in turn.

## II.     The initial decision to terminate Holzmeyer's long term benefits

---

[15] We thus do not consider two of Plaintiff's attached exhibits: an affidavit submitted by Holzmeyer (Pl.'s Exhibit 3) and copies of certain of Holzmeyer's x-ray images (Pl.'s Exhibit 4). We see no reason to exclude, however, the text of the Walgreen's Plan, attached as Plaintiff's Exhibit 2, whose definition of long-term disability is reproduced several times within the administrative record.

Plaintiff challenges the termination of benefits on a number of interrelated grounds. He asserts that Sedgwick "ignored" or "discounted" the objective medical evidence establishing his disability, that it unduly disregarded the opinions of his treating physicians, that its own decision was based on less than full consideration of the record evidence, that its reasoning was internally consistent with the opinions offered by its own record-reviewing physicians, and that its decision to terminate benefits without any evidence of "improvement" in Holzmeyer's condition was *per se* irrational. *See* Docket No. 28 at 35–42. While we do not accept all of Plaintiff's theories,[16] we agree that Sedgwick's decision was unreasonable in one determinative respect. The record review opinions of Drs. Parisien and Lewis—upon which Sedgwick's letter of termination principally relied—either ignored or misconstrued the functional capacity evaluations proffered by Holzmeyer's treating physicians. Rather than grapple with the inconsistency between these opinions, Sedgwick proceeded as if there were no inconsistency to explain; such a failure, on an issue so central to its decision, runs afoul of ERISA's mandate of procedural and substantive reasonableness.

Before addressing the fatal deficiency in Sedgwick's method, however, we must first resolve Plaintiff's more broad-based objections. First, Plaintiff's contention notwithstanding, it is

---

[16] In particular, we will not engage in an extended discussion of Plaintiff's contention that, having at least once found Holzmeyer disabled, it was inherently unreasonable for the administrator to reverse that decision without concrete evidence of improvement in his condition. Plaintiff cites *Leger v. Tribune Long Term Disability Benefit Plan,* 557 F.3d 823, 832 (7th Cir. 2009), in support of this argument, but the Seventh Circuit's decision there actually cautioned *against* construing an initial award of benefits as creating a "presumption" that a plan administrator must overcome. 557 F.3d at 832 ("However, the previous payment of benefits is just one 'circumstance,' i.e. factor, to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome."). As Defendant points out, its initial benefits awards appear to be tied to concrete medical events, like the two surgeries Holzmeyer underwent in 2010 and 2011. *See* R. 172–173; R. 89–90; R. 83; R. 206–214. It was not *per se* unreasonable for Sedgwick to grant him benefits for discrete periods of time, reserving a decision on whether his condition rendered him *permanently* disabled. Additionally, the Sedgwick claim procedures Plaintiff cites in support of its claim that Sedgwick violated its own protocols, *see* Docket No. 28 at 40–41 (citing *Wilson v. Walgreen Income Protection Plan for Pharmacists and Registered Nurses,* 2013 WL 1799599, at *35 (M.D. Fla. Apr. 29, 2013), are not appropriate for consideration here; they are not part of the administrative record in this case.

not inherently unreasonable for a plan administrator to rely on the opinions of record reviewing physicians in assessing disability. *See Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009) (upholding denial of benefits where administrator relied on the opinions of five physicians who reviewed the record but did not examine claimant). As the Seventh Circuit has explained, there is no "authority that generally prohibits the commonplace practice of doctors arriving at professional opinions after reviewing medical files. In such file reviews, doctors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render and expert opinion without direct consultation." *Davis v. Unum Life Ins. Co. of Am.,* 444 F.3d 569, 577 (7th Cir. 2006). It may be natural to suspect that a doctor hired by an administrator to render an expert opinion might be biased towards the source of his or her pay, but the Seventh Circuit has determined that any such tilt is likely to be offset by the tendency of treating physicians to "advocate" on behalf of their patients. *See Hawkins v. First Union Corp. Long-Term Disability Plan,* 326 F.3d 914, 917 (7th Cir. 2003); *Davis,* 444 F.3d at 578. *See also Black & Decker,* 538 U.S. at 834 (holding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician").

Nor is a claim administrator always unjustified in rejecting the opinions of treating physicians that a claimant is disabled, or in according less weight to reports of disability not supported by objective evidence. It is not uncommon for doctors scrutinizing a claimant's medical—and claim administrators in turn—to observe a disconnect between reported subjective pain symptoms and a dearth of objective evidence of disability. "[A] distinction exists . . . between the amount of fatigue or pain an individual experiences . . . and how much an individual's degree of pain limits his functional capacities, which can be objectively measured."

*Speciale v. Blue Cross & Blue Shield Ass'n,* 538 F.3d 615, 622 (7th Cir. 2008) (quoting *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007)). A claim administrator is entitled to disagree with a treating physician, or to discount some reports in favor of other evidence it finds more credible—so long as it explains and supports its decision to do so. *See, e.g.*, *Speciale,* 538 F.3d at 623–624 (choosing to weigh one doctor's "specific, … quantified" functional capacity report over the opinion of another doctor whose report was more "tentative"); *see also Devlin v. Walgreen Income Protection Plan for Store Managers,* 2013 WL 4089900, at *6 (W.D. Mich. Aug. 13, 2013) (holding that deference to claim administrator's decision was appropriate where defendant credited one functional capacity opinion and gave less weight to another).

A claim administrator cannot, however, simply ignore or misconstrue evidence favorable to a claimant. A functional capacity evaluation prepared by a claimant's physician merits serious consideration, and it cannot be cast aside solely on the grounds that the doctor's evaluation was based on the claimant's complaints of pain. *See Leger,* 557 F.3d at 832. In such circumstances, the plan must "explain why, despite evidence to the contrary in the FCE, it nevertheless finds [plaintiff's] complaints of pain unreliable . . . . Without further explanation, there is an 'absence of reasoning in the record.'" *Id.* at 834–835.

Here, both Dr. Rupert and Dr. Whitacre prepared FCEs whose findings are inconsistent with Holzmeyer's ability to perform his former job as a home pharmacist on a full-time basis. In his FCE, created on July 21, 2011, pain specialist Dr. Rupert found that Holzmeyer was capable of sitting only up to one hour a day, and doing work of any type for only two to three hours a day—and at that, only with breaks allowing him to lie down. R. 237. He opined that these restrictions were permanent. *Id.* Shortly thereafter, on August 9, 2011, Dr. Whitacre also submitted an FCE. He found that Holzmeyer could sit 3-4 hours in an 8 hour workday, albeit

with breaks every 15 minutes. Unlike Rupert, he characterized these limitations as temporary; he also found that, with time sitting, standing, and walking aggregated, Holzmeyer could work for eight hours in a day.[17] *Id.*

Dr. Jamie Lee Lewis, with whom Sedgwick contracted to review Holzmeyer's records and provide a disability opinion, stated in his report that he had reviewed Dr. Rupert's FCE and had attempted, unsuccessfully, to reach Dr. Rupert on the phone. Citing the lack of "follow-up notes" from Holzmeyer's January 2011 back surgery, Dr. Lewis opined that there were no "objective findings" in the record that would support the conclusion that Holzmeyer was unable to perform a sedentary job. R. 276–277. Other than noting he had reviewed Rupert's FCE, Lewis made no mention of Rupert's findings that Holzmeyer could only sit up to one hour a day, and could only perform work in any position up to three hours a day. *Id.*

Dr. Victor Parisien noted in his report that he viewed Dr. Whitacre's FCE. Rather than ignoring Whitacre's views on functional capacity, Parisien purported to endorse them. "The limitations as established by Dr. Whitacre on 8/9/11 appear to be appropriate, namely that he could sit for four hours with a break every 15 minutes, he could stand for three hours with breaks every 20 minutes, and walk for one hour with breaks every 15 minutes. He could work an eight hour day . . . ." R. 281. Without further comment, Parisien then drew the conclusion, ostensibly based on Whitacre's FCE, that "the employee is able to perform his sedentary job as of 07/01/11."[18] *Id.* To put it mildly, such a conclusion is puzzling. Holzmeyer's sedentary job as a

---

[17] Later, after Sedgwick had already made its initial decision to terminate benefits, Dr. Whitacre partially revised his opinion, finding Holzmeyer more functionally limited than before. R.325.

[18] Parisien's report also states that, after his attempt to contact Dr. Whitacre himself was unsuccessful, he spoke to Delia Lowe, Whitacre's "certified surgical technician." According to Parisien, Lowe told him that "Dr. Whitacre agrees that the patient could do a sedentary job *with restrictions as outlined in his functional capacity evaluation of 08/09/11.*" R. 279. (emphasis added). Leaving aside the question of whether the prediction of Whitacre's surgical technician as to his supervisor's opinions should carry any weight, Lowe's quoted statement merely suggests that

home pharmacist *requires* sitting; to state, as Whitacre did, that Holzmeyer could piece together an eight-hour workday by walking, standing, and sitting for some combination of hours is not to conclude that Holzmeyer was capable of sitting in front of a computer screen for eight hours. As Parisien himself acknowledged in his report, Holzmeyer's back pain was exacerbated by sitting as much as by other postures. R. 280 ("His pain varied from a 3/10 to a 10/10, aggravated by sitting, standing, lying down.").  Whitacre's FCE opined that Holzmeyer could sit for only three to four hours daily; for Parisien to treat this report as endorsing capability to perform Holzmeyer's home pharmacist occupation for an *eight*-hour workday was a misinterpretation. Parisien never mentioned Dr. Rupert's FCE, or attempted to square its finding of severe functional limitations with his own conclusions.

Sedgwick's termination letter, in which it was bound by ERISA to explain to Holzmeyer the bases for the denial of his benefits, expressly incorporated the opinions of Lewis and Parisien. In the letter, Sedgwick said it had learned from a Walgreen's HR representative that Holzmeyer was "a work at home pharmacist, which is a sedentary position." R. 285. After presenting condensed versions of the opinions proffered by Lewis and Parisien, the letter concluded: "[T]here is no objective medical documentation to support restrictions and limitations that would prevent you from perform [sic] your sedentary job duties." *Id.*

We find Sedgwick's treatment of the opinions of Drs. Rupert and Whitacre unreasonable, in two related respects.

## A. Dr. Rupert's opinions

---

Holzmeyer could work at a sedentary job under the conditions described in the FCE; it does not state, explicitly or implicitly, that the "home pharmacist" position is such a job.

First, both the record reviewing physicians and Sedgwick's termination letter simply glossed over Rupert's opinion that Holzmeyer could perform work in a sitting position for only one hour a day at maximum—a finding, of course, flatly incompatible with their preferred assessment of his functional capacity. As the Seventh Circuit has made clear in several analogous decisions, this runs afoul of the procedural reasonableness demanded of claim administrators even under courts' deferential review of their exercise of discretion.

In *Majeski v. Metropolitan Life Insurance Co.*, 590 F.3d 478 (7th Cir. 2009), the disability claimant's physical therapist performed a functional capacity evaluation in which she determined that the claimant, whose work involved typing, could perform the task only for a very short period without experiencing pain. 590 F.3d at 480–481. A record-reviewing physician hired by the defendant, though he acknowledged viewing the treating physician's evaluation, nonetheless opined that there were "minimal objective findings on physical and neurological examination" to support a finding of disability; he directly addressed neither the treating physician's functional capacity finding nor his conclusion that the claimant was unable to perform her occupation *Id.* at 481. The defendant's physician also failed to address a FCE questionnaire filled about by another treating physician, which had also endorsed the view that the claimant had a limited functional capacity—apparently because the company had not forwarded the documents to him. *Id.* The defendant, MetLife, relied instead on the opinion of its retained physician in denying the disability claim. "By ignoring [plaintiff's] key medical evidence," the Seventh Circuit reasoned, "Metlife can hardly be said to have afforded her an opportunity for full and fair review, and its failure to address that evidence in its determination surely constitutes an absence of reasoning." *Id.* at 484.

*Majeski* relied upon, and echoed, the Seventh Circuit's reasoning in two similar decisions. In *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823 (7th Cir. 2009), a physician hired by the defendant discounted a treating doctor's FCE because it is "based on [plaintiff's] subjective complaints" and "not supported by any objectively documented deficit." 557 F.3d at 834. The court held the Plan's reliance on such an analysis to be unreasonable: "Under these circumstances, we believe it was incumbent on the Plan (or the Plan's consultant) to do more than just dismiss the complaints [of pain] out of hand. Instead, the Plan must explain why, despite evidence to the contrary in the FCE, it nevertheless finds [plaintiff's] complaints of pain unreliable. . . ." *Id.* at 835. The Seventh Circuit made an even more categorical statement in its decision in *Love v. National City Corp. Welfare Benefits Plan*, 574 F.3d 392 (7th Cir. 2009), which held that a plan administrator must not only "provide a reasonable explanation for its determination," but must also "address any reliable, contrary evidence presented by the claimant"—including the opinions of his or her treating physician. 574 F.3d at 397.

From these strands of authority, we can distill at least one clear requirement: if a claim administrator contradicts the findings of treating physicians as to the functional capacity of a claimant, it must explain itself—and a cursory reference to the absence of *other* evidence in the claimant's favor is not enough. *See, e.g., Leger,* 557 F.3d at 834. Sedgwick's letter to Holzmeyer runs afoul of this requirement with respect to Dr. Rupert's report. The letter did mention the fact that Rupert had submitted an opinion, but it made no attempt to address his findings, or to reconcile the gap between his view of Holzmeyer's functional capacity and that adopted by its record reviewing physicians. *Cf. Speciale,* 538 F.3d at 623–624 (approving of an administrator's decision to give greater weight to the opinion of a physician who gave a "specific . . . quantified"

opinion and had "expertise in pain management" over the opinion of a doctor whose opinion lacked those qualifications). Given Sedgwick's utter failure to explain itself in its letter, we can only surmise from the letter's wording that Sedgwick disregarded Rupert's FCE because it was based on a "subjective" assessment of pain rather than objective data; its summary of the report of Dr. Lewis, whom it assigned to review Rupert's opinions, cites Holzmeyer's surgical history before asserting succinctly: "From a physical medicine and rehabilitation perspective you would be able to perform a sedentary job *with no objective findings to support the contrary*." R. 285 (emphasis added). As the Seventh Circuit has made clear, dismissing an FCE out of hand because it is not "objective" evidence, without any other explanation, falls short of the reasoned analysis that ERISA commands of claim administrators. *See Majeski,* 590 F.3d at 484 (citing *Leger,* 557 F.3d at 834–835).

## B. Dr. Whitacre's opinions and Holzmeyer's job description

Second, Sedgwick's treatment of the opinions offered by Dr. Whitacre betrays its failure to engage in any rigorous analysis of the functional requirements of Holzmeyer's "own occupation" with Walgreens.

A plan administrator's review is arbitrary and capricious when it fails to make reasonable inquiry into the requirements of the claimant's occupation according to its own definitional parameters. *Quinn v. Blue Cross & Blue Shield Ass'n,* 161 F.3d 472, 476–477 (7th Cir. 1998), *abrogation on different grounds recognized by Huss v. IBM Medical & Dental Plan*, 418 Fed. Appx. 498, 511 (7th Cir. 2011); *Kirkpatrick v. Liberty Mut. Grp., Inc.*, 856 F. Supp. 2d 977, 993 (S.D. Ind. 2012). As we have already noted, Dr. Whitacre opined that Holzmeyer could perform work in a sitting position for a maximum of only four hours in a given eight-hour workday. R.

248. Without offering any further explanation, Dr. Parisien treated this FCE as establishing that "the employee is able to perform his sedentary job" as a home pharmacist. R. 281. Sedgwick's letter terminating benefits adopted Parisien's opinions. Noting only that the home pharmacist job is a "sedentary" one, the letter stated that "[t]his position would allow for breaks from sitting as indicated in the restrictions and limitations." R. 285.

Plaintiff argues that Sedgwick's conduct was *per se* arbitrary and capricious in this respect because it failed to obtain a detailed, written job description for Holzmeyer's position and make it available to its record reviewing consultants. Docket No. 28 at 41–42. Plaintiff has directed us to no language in the Plan creating such a fixed requirement, and Defendant is correct in retorting that any duty to obtain a written job description arises not invariably from ERISA, but rather, if at all, from a given plan's language. Docket No. 30 at 29–32. The more general strictures of procedural reasonableness, however, do require a plan administrator to establish some form of nexus between its functional capacity findings and the applicable disability definition. *See, e.g., O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 962 (7th Cir. 2001). Here, it was insufficient simply to observe that the position was "sedentary."[19] It only stands to reason that there are a number of sedentary positions that an employee would be unable to occupy if he was capable of sitting only *four* hours in a given *eight*-hour workday—and according to Holzmeyer himself, his "home pharmacist" job was one of them. *See* Pl.'s Ex. 3 at ¶¶ 3, 8 ("I was required to sit for my entire shift . . . . I was required to review on average one

---

[19] As Defendant notes in its briefs, Sedgwick's internal records also reflect that a Walgreen's HR representative described the position to them as a "sedentary position with the opportunity to take a break every 15 minutes from sitting." R. 61. However, Dr. Whitacre's FCE, which *also* assumed Holzmeyer's ability to take breaks every 15 minutes, nevertheless stated that he could sit only for four hours in a day. R. 248. The presence or absence of breaks every 15 minutes is thus irrelevant to the central analytical shortcoming of Parisien's opinion and Sedgwick's final decision—their failure to account for the discrepancy between a four-hour functional capacity and an eight-hour workday.

prescription every 13.7 seconds and to perform one drug utilization every 4.6 seconds . . . . On average, I was reviewing 1500-2000 prescriptions per day.").[20] Sedgwick would have remained within the bounds of its discretion if it, or the medical opinions on which it relied, had articulated grounds for rejecting the restrictive functional capacity findings offered by Dr. Whitacre; it would have remained within its discretion, alternately, if it had explained how Holzmeyer could perform his work adequately despite being able to sit only four hours a day. It was an abuse of its discretion, however, to pave over the significant potential discrepancy between the Whitacre functional capacity opinion it ostensibly endorsed and the possible requirements of Holzmeyer's "own occupation." *See Kirkpatrick,* 856 F. Supp. 2d at 993 (holding that a plan administrator's failure to determine the "material and substantial" duties inherent in claimant's "sedentary" job helped render its final conclusions on disability arbitrary and capricious).

## C. Unreasonableness of Sedgwick's initial termination decision

Sedgwick either ignored or misconstrued the opinions of Drs. Rupert and Whitacre; taken as a whole, its failure to explain—or even acknowledge—its disregard of this evidence runs afoul of the procedural reasonableness and clarity of communication required by ERISA.

The limiting effects of chronic pain on a person's ability to engage in work often defy "objective" measurement, and as such, the issue of pain presents thorny evidentiary questions for plan administrators and reviewing courts alike. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007). The issue is particularly salient, of course, when the job in question is a

---

[20] Holzmeyer's affidavit, attached as Plaintiff's Exhibit 3, is not part of the administrative record, and, as we have already noted, Sedgwick's decision-making is to be reviewed only on the basis of the record it had at its disposal at the time it made the benefits termination decision. We include Holzmeyer's own statement only to illustrate the extent to which a "sedentary" job can be incompatible with an ability to sit for only four hours in a workday—and to illustrate the extent to which Sedgwick was inadequate either in investigating the nature of Holzmeyer's job or in documenting and explaining the results of its investigation.

sedentary one—in other words, where pain is more likely to be the principal source of disability rather than more easily measurable physical ailments. *See, e.g., Hawkins,* 326 F.3d at 918–919 (discussing the role of pain in establishing the disability of a sedentary computer programmer). Under such circumstances, the disability determination depends at least in part on an inquiry into the claimant's credibility.

Here, the only two treating physicians who submitted opinions regarding the limiting effect of Holzmeyer's pain on his ability to engage in sedentary work both found that his functional capacity was less than full—Dr. Rupert opined that he could sit for only one hour, Dr. Whitacre four. *Cf. Holmstrom,* 615 F.3d at 775 (noting that "[e]very doctor who has actually seen [the claimant] in the pertinent time period has concluded she is disabled"). Both Whitacre and Rupert, an orthopedic specialist and a pain management specialist respectively, examined Holzmeyer on multiple occasions and presumably had considerably greater opportunities to assess the credibility of Holzmeyer's claims of disabling pain than did the Sedgwick consultants.[21] *See Gessling v. Group Long Term Disability Plan for Employees of Sprint/United Mgmt. Co.*, 693 F. Supp. 2d 856, 866 (S.D. Ind. 2010). Moreover, and contrary to Defendant's arguments, the opinions of the treating physicians are hardly inconsistent with the "objective" record. Holzmeyer underwent MRI or CT scan imaging on several occasions in 2010 and 2011; the images showed "multilevel disc bulging," "moderate to severe stenosis," and "chronic degenerative disease," among other issues. *See* R. 102–105 (April 7, 2010 CT scan); R. 549–550 (September 27, 2010 MRI); R. 194 (October 18, 2010 CT scan). Holzmeyer's back problems dated back more than two decades and persisted despite a number of surgeries and medications;

---

[21] There are records of at least five appointments with Dr. Whitacre, *see* R. 192–194, 249, 323, 325, 386, and at least five with Dr. Rupert. *See* R. 224–228, 242, 245, 237, 279. We are thus unpersuaded by Defendant's implication that the opinions of Whitacre and Rupert should be discounted because Holzmeyer only saw them "a few times." *See* Docket No. 32 at 5.

the record does not indicate, nor do any of Sedgwick's consultant physicians suggest, that he was lying, malingering, or drug-seeking in his consistent complaints of pain.[22] *Cf. Holmstrom,* 615 F.3d at 775; *Gessling,* 693 F. Supp. 2d at 866 (noting that where a claimant "aggressively pursued for several years a range of therapies for his pain . . . [t]hose efforts are hard to reconcile with a theory that [he] was exaggerating or lying").

This is not the first time, of course, that this court has assessed a plan administrator's reasonableness in disregarding treating physicians' opinions on the limiting effects of pain in favor of its own doctors' opinions that a claimant is capable of working. In *Gessling v. Group Long Term Disability Plan,* 693 F. Supp. 2d 856 (S.D. Ind. 2010), we determined that the defendant's record reviewing doctors had failed to give due weight to treating physicians' opinions on the functional limitations inflicted by back pain:

> The court does not mean to suggest that it is reviving any requirement of special deference to a treating physician. Far from it. But to disagree with an apparently sound opinion of a treating physician, a plan administrator needs something much more solid than the consulting physicians provided in this case. The medical records did not show that [the claimant and his treating physician] must have been correct—the problems of subjective pain and resulting limitations are difficult to evaluate based on records alone. But after reviewing the records, the reviewing physicians failed to come to grips with the real problem, the whole person, and the history that corroborated his complaints of pain.

693 F. Supp. 2d at 866. *See also Anderson v. Hartford Life and Acc. Ins. Co.*, 2010 WL 3703037, at *7 (S.D. Ind. Sept. 10, 2010) (applying *Gessling*'s language to similar facts). At least where the FCEs of a claimant's treating physicians have a "sound" basis, an administrator must "rely on something more solid than the opinions of the consulting physicians" to rebut them. *See*

---

[22] Defendant points out that Plaintiff "rejected the repeated suggestions of a pain stimulator" as a means of managing his pain. Docket No. 32 at 5 (citing R. 325–326, 530–531, 533–534).

*Anderson*, 2010 WL 3703037, at \*7. We conclude that Sedgwick was arbitrary and capricious in terminating Holzmeyer's benefits in the way that it did.

### III.    Denial of Holzmeyer's appeal

Holzmeyer argues in the alternative that Sedgwick's denial of his appeal from the termination of benefits fell short of the "full and fair review" mandated by ERISA. He points principally to Sedgwick's failure to address the fact that the Social Security Administration (SSA) had found him to be disabled, contending that it was unreasonable to deny an appeal without even mentioning that compelling piece of evidence in his favor. Docket No. 28 at 42–44. We agree.

ERISA requires that a plan administrator afford a claimant a "full and fair review" of its decision to deny benefits. *Holmstrom,* 615 F.3d at 766. In other words, it must furnish an appeal that takes into account all "comments, documents, records, and other information submitted by the claimant relating to his claim." 29 C.F.R. § 2560.603-1(h). *See also Majeski*, 590 F.3d at 484 (administrator must "address any reliable, contrary evidence presented by the claimant" on appeal); *Love,* 574 F.3d at 397.

Although an administrator is not "forever bound" by an SSA determination of disability, its "failure to consider the determination in making its own benefit decisions suggests arbitrary decisionmaking." *Holmstrom,* 615 F.3d at 772–773. "Disability" for social security purposes is defined by statute as the "inability to engage in *any* substantial gainful activity by reason of any medically determinable physical or mental impairment" which persists for at least one year or which can be expected to lead to death. 42 U.S.C. § 423(d)(1)(A) (emphasis added). This definition is a stringent one, and an administrator's failure to address a claimant's SSA disability

finding is thus especially questionable when the ERISA plan's disability definition is less exacting. *Demaree v. Life Ins. Co. of N. Am.,* 789 F. Supp. 2d 1002, 1014 (S.D. Ind. 2011) (citing *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 844 (7th Cir. 2009), and *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 333 (7th Cir. 2000)).

Here, the SSA approved Holzmeyer's application for SSDI benefits—an application he was required to make under the terms of the Plan. R. 298–301. Because the SSA approved his initial application, the only documentation Holzmeyer had available was the agency's October 22, 2011 letter to him announcing its favorable decision, which Holzmeyer submitted to Sedgwick in conjunction with his appeal. *Id.* In his letter to Sedgwick announcing his client's appeal, Holzmeyer's counsel Michael Hayden specifically mentioned the SSA award as new evidence. R. 295. As Plaintiff notes, the Plan's definition of disability is—at least arguably—less strict than that employed to determine eligibility for Social Security disability. In contrast to the SSA definition, the Plan recites that a claimant is eligible for long-term disability benefits if he or she is "prevented from performing *one or more* of the essential duties of [his or her] *own occupation* and [is] receiving appropriate care and treatment from a doctor on a continuing basis." Pl.'s Ex. 2 at 8 (emphasis added) Nevertheless, nowhere in its three-page letter rejecting Holzmeyer's appeal did Sedgwick mention his SSA award of benefits or attempt to explain why he was disabled under the federal government's stringent definition but not under Walgreen's seemingly more liberal standard. *See* R. 355–358. Sedgwick's second, shorter letter rejecting his second appeal likewise failed to mention his SSA benefits award. R. 1065.

Defendant is correct to note that "SSA awards . . . are not binding on ERISA claim administrators." Docket No. 30 at 33 (citing *Mote v. Aetna Life Ins. Co.,* 502 F.3d 601, 610 (7th Cir. 2007)). The Social Security statute requires the SSA to consider a "uniform set of federal

criteria," unlike ERISA disability determinations that turn on "interpretation of terms in the plan at issue," *See Barnick v. World Color Press, Inc.*, 88 Fed. Appx. 943, 944–945 (7th Cir. 2004) (citations omitted); an administrator may act reasonably in denying a claimant benefits even if he has been found eligible for SSDI. *See, e.g., Anderson v. Operative Plasters' and Cement Masons' Int'l Ass'n Local No. 12 Pension & Welfare Plans,* 991 F.2d 356, 358–359 (7th Cir. 1993). However, though the Seventh Circuit has not spoken with uniform voice on the subject, a number of its recent decisions have reaffirmed the general principle that favorable SSA decisions should at least be considered, if not blindly followed. *See Love,* 574 F.3d at 398 ("SSA determinations are often instructive, but they are not determinative"); *Holmstrom*, 615 F.3d at 773 (noting that SSA awards are particularly persuasive where the Social Security standard is more stringent than the plan standard); *Raybourne v. Cigna Life Ins. Co. of N.Y.*, 700 F.3d 1076, 1087 (7th Cir. 2012). *But see Barnick,* 88 Fed Appx. at 944–945 (stating that a plan acted reasonably in failing to consider an SSA award where "[t]he [p]lan . . . does not require [the administrator] to consider the SSA's finding of disability in making its own disability determination"). Given an administrator's obligation to "address any reliable, contrary evidence submitted by the claimant" on appeal, *see Love,* 574 F.3d at 397, we conclude that Sedgwick's failure to address the SSA award *at all* "surely constitutes an absence of reasoning." *Majeski,* 590 F.3d at 484. Perhaps sound reasoning underlay Sedgwick's determination to distinguish Holzmeyer's SSDI disability from its own conclusion that he remained able to work.[23] If so, Sedgwick owed it to Holzmeyer to explain itself.

[23] Defendant suggests in its brief that, since Holzmeyer provided only an SSDI award letter rather than a full SSA administrative record, coupled with an ALJ's written opinion, the Social Security award should carry "little, if any" weight. Docket No. 30 at 34 (citing *Barnick,* 88 Fed. Appx. at 944–945, and *Smith v. Life Ins. Co. of Am.,* 2011 WL 766071 (S.D. Ohio Feb. 25, 2011)). The cases Defendant has cited do not establish the proposition that a Social Security award without an accompanying record may be more readily discounted. *Barnick* did conclude that a plan administrator who failed to consider an SSDI award did not abuse its discretion, but it did not state that an SSDI

## IV. Conclusion

By inadequately explaining—or ignoring or misrepresenting—its disagreement with the functional capacity evaluations provided by Drs. Rupert and Whitacre, and by failing to articulate how its own assessment of Holzmeyer's work capabilities interacted with his job description, we have found that Sedgwick fell short of the reasonableness required of plan administrators' decision-making even under the deferential review we exercise. In similar fashion, Sedgwick's denial of Holzmeyer's appeals without so much as mentioning the fact that the Social Security Administration had found him permanently disabled raises red flags. The Plan here vests Sedgwick with discretion in applying its terms to award or deny disability benefits, but it does not liberate Sedgwick wholly from its ERISA-imposed responsibility to express the reasons underlying its decision-making and to draw connections between the relevant evidence—including evidence favorable to the claimant—and its final determination.

In holding that Sedgwick abused its discretion, we conclude that the process it followed was deficient—not, necessarily, that its termination of benefits was substantively erroneous. When a plan administrator "fails to provide an adequate reasoning" for its actions, warranting summary judgment against it, "the proper remedy in an ERISA case . . . is to remand for further findings or explanations, unless it is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Leger,* 557 F.3d at 835

---

award letter is less valuable than an ALJ decision. *See* 88 Fed. Appx. at 944–945. *Smith,* the Southern District of Ohio decision cited by Defendant, comes closer to endorsing Defendant's position, but in different circumstances; there, the court found that an award letter unaccompanied by further explanation was insufficient to outweigh the "ample medical evidence" that supported the plan administrator's denial of benefits. 2011 WL 766071, at *10. Even in *Smith,* however, the court acknowledged the general rule that "the reviewing court should weigh [an SSDI award] in favor of a finding that the [benefits denial] decision was arbitrary and capricious." *Id.* at *9.

(quoting *Tate,* 545 F.3d at 563). Rare indeed is a case whose record contains such "powerfully persuasive evidence" warranting the court to "short-circuit" the usual decision-making process vesting discretion in the claim administrator, and this is not such a case. *See Majeski,* 590 F.3d at 484.

Plaintiff's motion for summary judgment is therefore GRANTED, and Defendant's cross motion for summary judgment is DENIED. We REMAND the matter for new consideration consistent with this opinion.

IT IS SO ORDERED.

Date: _____9/4/2014_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Bridget L. O'Ryan
O'RYAN LAW FIRM
boryan@oryanlawfirm.com

Eric P. Mathisen
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. - Valpo
eric.mathisen@ogletreedeakins.com

Mark E. Schmidtke
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. - Valpo
mark.schmidtke@ogletreedeakins.com

Kimberly A. Jones
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C.-Chicago
kimberly.jones@ogletreedeakins.com